Argued and submitted December 2, 2002, reversed in part; otherwise affirmed
September 10, 2003

## STATE OF OREGON,
*Respondent,*

*v.*

## GINA A. DAVIS,
*Appellant.*

00020414; A111545

76 P3d 144

Eric M. Cumfer argued the cause and filed the brief for appellant.

Katherine H. Waldo, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Haselton, Presiding Judge, and Linder and Wollheim, Judges.

LINDER, J.

## LINDER, J.

Defendant appeals her convictions for first-degree official misconduct, ORS 162.415, and disorderly conduct, ORS 166.025, assigning error to the trial court's denial of her motions for judgments of acquittal on both counts. We affirm the judgment of conviction for disorderly conduct but reverse the judgment of conviction for official misconduct in the first degree.

Because defendant was convicted, we view the evidence in the light most favorable to the state. *State v. King*, 307 Or 332, 339, 768 P2d 391 (1989). The charges arose from an incident on a train that occurred between defendant and Hattenburg, an Amtrak train conductor. Defendant was a reserve police officer for the Rogue River Police Department. At the time of the incident, however, she was traveling in a purely personal capacity with her four-year-old child. Defendant and her child boarded the train in Klamath Falls. Because of computer problems at Amtrak's Klamath Falls station, none of the passengers boarding there, including defendant and her child, were able to obtain tickets. Hattenburg therefore advised all unticketed passengers, including defendant, that they would need to disembark in Eugene to obtain tickets. Before arriving in Eugene, Hattenburg saw defendant in the train's "parlor" car, where first-class passengers can order drinks and view the scenery. Hattenburg reminded defendant that she would need to buy tickets when the train stopped in Eugene. Defendant said that she would do so.

The train stopped briefly in Eugene and then continued northbound. Hattenburg and another conductor conferred and realized that neither one of them saw defendant leave the train in Eugene to buy tickets. Consequently, after collecting tickets from the coach passengers, Hattenburg tried to locate defendant. Hattenburg found her in the parlor car, sitting at the bar. When Hattenburg asked defendant if she had purchased tickets in Eugene, defendant said she had not because she did not want to leave her child, who was asleep in the sleeping car. Hattenburg offered to call ahead to Albany to arrange for tickets for defendant and her child

using defendant's credit card. Defendant agreed, although she seemed agitated and was becoming verbally abusive towards Hattenburg. Hattenburg noticed that defendant smelled of alcohol and, with the rocking motion of the train, could not stand steadily.

The transaction took longer than expected because of a computer problem at the Albany Amtrak office. While they waited, defendant's verbally abusive statements to Hattenburg intensified, and defendant pulled her police badge out of her pocket and began to fidget with it. According to Hattenburg, defendant "just kind of held [the badge] in her hand at first and then she laid it on the table[.] * * * She would take the badge and stick it in her wallet and then pull it back out slightly again, then she would pull it out some more." At one point, defendant began "hitting it on the table." Hattenburg decided to call the Portland Amtrak office to arrange for the tickets. The transaction was refused using the credit card that defendant gave Hattenburg, and Hattenburg asked defendant if she had another credit card. Defendant, who was by then very agitated and was repeatedly swearing at Hattenburg, tossed a second credit card at Hattenburg, but later grabbed it back from her. The Portland Amtrak agent on the phone with Hattenburg apparently overheard defendant's verbal abuse and offered to call the police. Hattenburg at first told the Portland agent not to call police, but the agent became insistent, and Hattenburg agreed. When Hattenburg got off the phone, she told defendant that the police had been called. Defendant responded, "You fucking idiot. Who do you think you're dealing with. I am the police department. I am the police." Hattenburg left defendant in the parlor car. Four police officers boarded the train in Albany, approached defendant, and asked her to leave. Defendant was visibly intoxicated, her demeanor shifted between calm and "quite aggressive," and she yelled profanities at the officers. When she did not leave as the officers requested, they arrested her.

As noted, defendant challenges the trial court's denial of her motions for judgments of acquittal on both charges—*viz.*, disorderly conduct and first-degree official misconduct. We find no merit to defendant's challenge to the denial of her motion on the disorderly conduct charge, and we

affirm that conviction without further discussion. As we explain below, however, we agree with defendant that she was entitled to a judgment of acquittal on the official misconduct charge.

■    As relevant to this case, a public servant commits the crime of official misconduct in the first degree if, with intent to obtain a benefit or to harm another, "[t]he public servant knowingly performs an act constituting an unauthorized exercise in official duties." ORS 162.415(1)(b). The dispute here is whether a jury could find defendant's conduct to be an "unauthorized exercise in official duties." Viewing the evidence most favorably to the state, a jury could find on this record that defendant withdrew her badge and deliberately handled it so that Hattenburg would be aware that defendant was a police officer. A jury could further infer, from the circumstances as a whole, that defendant wanted some form of benefit to flow from that awareness. Among the reasonable possibilities on this record are that defendant wanted to be left alone and not be required to purchase a ticket or that she wanted Hattenburg to forgo calling the police.[1] Defendant argues that, nevertheless, "to be guilty of official misconduct I, [defendant] had to be acting in an official capacity exercising powers available to her as a result, and there was no evidence [defendant] did so." The state responds that defendant could be found to have acted in her official capacity during the encounter, because her police badge was something that she had "only by virtue of her position as a public servant" and her use of it in a private dispute was an "unauthorized exercise in official duties." Thus, the crux of the parties' disagreement is the meaning of the statutory language "unauthorized exercise in official duties" and the range of conduct it was intended to encompass.

In resolving that disagreement, the Supreme Court's decision in *State v. Florea*, 296 Or 500, 677 P2d 698 (1984), is instructive and effectively on point. The defendant in *Florea* challenged ORS 162.415(1)(b) as unconstitutionally vague, focusing on the language "unauthorized exercise in official

_____

[1] Defendant disputes whether either inference is permissible. We reject defendant's argument in that regard.

duties."[2] The court noted that the legislature deliberately had referred to an unauthorized exercise "in" official duties, rather than "of" official duties, perhaps "to avoid an apparent paradox: How can an unauthorized act constitute the exercise of one's official duties?" *Id.* at 502-03. The answer, the court concluded, was that the legislature meant "to forbid unauthorized acts by officials *in the course of* exercising their official functions." *Id.* at 503 (emphasis in original). Thus, to satisfy the statute, the unauthorized act must be done "in the defendant's official capacity," which the court concluded resolved defendant's vagueness challenge, because no public servant "should have a conceptual problem with the requirement that the act be performed in one's official capacity or in exercising the power of one's official position." *Id.* at 503-04. Significantly, by way of a footnote, the court equated the statute's language with the familiar concept of acts performed by public officials "under color of" law. *Id.* at 504 n 3.[3]

We agree with defendant that, as a matter of law, her conduct in this case was not an "unauthorized exercise in official duties" as that language was construed in *Florea*. Defendant was not on active duty; that fact is undisputed. Instead, she was out of uniform, taking a personal trip on personal time. At no point during her altercation with Hattenburg, or otherwise, did defendant purport to undertake or perform any police responsibility, duty, function, or role. Defendant did not, for example, assert her authority as a police officer to investigate, arrest, or restrain Hattenburg or anyone else. Viewed most favorably to the state, defendant at most withdrew her badge and handled in such a way that Hattenburg would see it and realize that defendant was a police officer.

---

[2] Actually, when *Florea* was decided, the statutory language was " 'unauthorized exercise in *his* official duties.' " 296 Or at 502 (quoting statute; emphasis added). It has since been codified in gender-neutral terms.

[3] Although the court did not say so expressly, it appears to have consulted legislative history in that regard. The official commentary adopted by the Criminal Law Revision Commission explains that ORS 162.415 was intended to replace a number of existing statutes dealing with "misconduct in public office" and was related to the common-law crime of misconduct in office, which is defined as "corrupt behavior by an officer in the exercise of the duties of his office or while *acting under color of his office.*" Commentary to Criminal Law Revision Commission Proposed Oregon Criminal Code, Final Draft and Report § 215, 210 (July 1970) (quoting Perkins, *Criminal Law* 485 (2d ed 1969)) (emphasis added).

■  That conduct was not action taken *in the course of exercising official police duties or functions.* A police officer is not catapulted into active duty merely by letting someone see her or his badge while on private time, any more than verbally identifying one's livelihood as a police officer would have that effect. To be sure, display of a badge serves to validate a police officer's assertion of official authority *when* the display is made simultaneously with an assertion of such authority—as, for example, when an officer displays a badge as identification in the course of an official investigation or execution of a warrant. But making a badge visible, in and of itself, without doing or saying anything more, does not transform either that act or whatever an off-duty police officer next says or does into conduct that is within the course of the police officer's official job, done pursuant to official capacity, or otherwise under "the color of law."[4] *See Williams v. United States,* 341 US 97, 99, 71 S Ct 576, 95 L Ed 774 (1951) (misconduct engaged in under "color of law" involves "[m]isuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law") (citation omitted); *see also Screws v. United States,* 325 US 91, 111, 65 S Ct 1031, 89 L Ed 1495 (1945) ("[U]nder 'color' of law means under 'pretense' of law. Thus acts of officers in the ambit of their personal pursuits are plainly excluded."); *State v. Ju Nun,* 53 Or 1, 6, 97 P 96 (1908) (actions are taken under "color of law" if done with "semblance of legal authority" even if that legal authority is invalid).

In arguing to the contrary, the state urges that, "but for" her position as a police officer, defendant would not have had access to a badge. Depending on the other circumstances involved, "but for" causation can suffice to establish that a public employee has violated the state's ethics laws, which are particularly broad in their reach. *See Davidson v. Oregon Government Ethics Comm.,* 300 Or 415, 421-22, 712 P2d 87 (1985) (describing the broad reach of the public employee ethics statute, which prohibited government employee's private purchase of a car at the fleet rate available for government purchases). The court in *Florea,* however, construed the

---

[4] Were the conclusion otherwise, government administrators concerned with the scope of their tort or other liability for the actions of police officers would have cause for grave concern.

first-degree official misconduct statute more narrowly than that—a defendant must have been acting *in an official capacity* and must have abused the powers, opportunities, or responsibilities of his or her office while in that capacity. Our reported cases affirming convictions for first-degree official misconduct under ORS 163.415(1)(b) all are consistent with that understanding of *Florea. See, e.g., State v. Gove*, 128 Or App 239, 241, 875 P2d 534 (1994) (police officer solicited sexual relations from a citizen while in the course of performing or representing that he was performing his duties); *State v. Moffitt*, 104 Or App 340, 342, 801 P2d 855 (1990) (on-duty police officer ordered woman to get into his police car, then demanded that she have sexual contact with him); *State v. Gortmaker*, 60 Or App 723, 747, 655 P2d 575 (1982), *aff'd*, 295 Or 505 (1983), *cert den*, 465 US 1066 (1984) (jury could find from evidence that defendant, in asking subordinates to perform research for him on work time that related to a private matter, made the request while acting in his official capacity as district attorney).

Here, defendant may have abused the trust placed in her as a police officer by trying, while off duty, to use the fact that she was a police officer to be treated more favorably than a private citizen. Her conduct in that regard is not to be condoned and may have violated personnel policies and subjected her to employment-related sanctions or public ethics laws prohibitions. But her actions did not satisfy the elements of official misconduct in the first degree under ORS 162.415(1)(b). Defendant's motion for judgment of acquittal on that charge should have been granted.

Judgment of conviction for official misconduct reversed; otherwise affirmed.